**West v. West**

C.P. of Berks County, no. 4247-90 A.D.

*John A. Boccabella,* for plaintiff.
*Eugene C. LaManna,* for defendant.

GRIM, *J.,* October 31, 1995—The above captioned matter is a custody dispute. The following are the pertinent facts.

The parties were formerly married. They are the parents of three children: Rebecca S. West, Becci, born November 13, 1979, William Brady West, Brady, born December 9, 1987, and Gary N. West, born March 15, 1990. Plaintiff, William J. West Jr., father, is an obstetrician/gynecologist. During the marriage he was employed as an intern and resident. Defendant, Rebecca West, mother, had been employed as an executive secretary for a hospital but quit after the birth of Brady to stay home and care for the children. Mother now attends college in a two year course of study to become a physical therapist assistant. Upon her graduation she will receive an associate's degree.

The marriage was troubled. Mother alleges that father physically abused her throughout the marriage and even

after the separation. Father denies that he abused mother. He does not deny, however, that he had touched mother, but he states that such contact had been in the form of pushing rather than hitting or slapping and had been occasioned by mother's provocation and/or prior physical conduct.

During the marriage the parties lived in Havertown, Pennsylvania. They separated two months before Gary's birth when father vacated the marital residence. Several months later Father began living with his paramour, Jeanne, whom he eventually married.

They have a daughter who is approximately 1 year old. The present Mrs. West is a registered nurse. She works one to two days per week when father does not have custody of his children.

Mother has a steady relationship with another man. Father has met him and has no problems with him or with his behavior towards the children.

Custodial problems began soon after the separation. Mother nursed Gary and did not want father to remove Gary from the household. She agreed that father could come to the former marital residence for visitation. Father, however, insisted that he be allowed to bring his paramour along for the visitation. A court order resolved these conflicts.

After father finished his residency he obtained a position in a Reading medical practice. The parties believed that it was in the children's best interests for them to live near father. Therefore, father had a home built for mother and the children in the Wilson School District. Even though mother is from Cumberland County and her family still resides there she agreed to this arrangement. Father lives in the same school district, approximately one mile away.

Custody of the children has been governed by a consent order dated March 11, 1991, whereby the parties share legal custody and mother has primary physical custody. Father testified that he had agreed to such an arrangement because the boys had been young and he had believed that mother would take good care of the children. His lawyer had also informed him that these provisions are customary.

Father testified that he now seeks primary or shared custody because the children are now older and want to spend more time with him and mother resists granting him more time. Under a temporary order pending the resolution of the custody proceeding the parties alternated custody monthly. Father insists that these arrangements worked out fine. Mother believes that it was confusing for the younger children.

Father contends that problems have occurred during exchanges of the children; the parties argue and engage in name-calling in the children's presence. Father also complains that mother has too much control over the children and refuses to allow him to have any extra time with them when he or the children want it. Father testified that beginning three years ago Becci, especially, has requested more visitation and that mother usually has refused such requests. For a long time father wanted overnight visitation during his weekly Thursday evening visitation. Mother originally denied his requests but eventually she permitted the children to stay overnight on the Thursday evenings preceding her weekends.

The parties engaged in counseling sessions to attempt to parent and cooperate better, but the counseling was largely unsuccessful. They admit that they should get along better but given their present state of mind they are unable to do, so.

Father believes that he is better able to handle parenting decisions than mother. He thinks that mother relies too much on the advice of therapists, counselors, and lawyers. He testified that he does not have to consult with other professionals to make decisions. He always made the decisions regarding the children during the parties' marriage because by his own assessment he has more education and intelligence than mother.

In point of fact, father has continued unilaterally to make decisions regarding the children without consulting mother in direct violation of her wishes despite the fact that under the current order mother has primary physical custody and shared legal custody. For example, father wanted to take the children to Disney World during the school year; mother wanted father to wait until school was over. Father ignored mother's wishes and took the children out of school for a vacation in Disney World. Father testified that he saw no problem with this and that he does as he pleases with his children.

In another instance, father had desired to take the children on a weekend which was not his under the custody order. Mother had agreed, but had informed father that he should not keep them overnight during his Thursday evening visitation and if he did, then she would assume that he no longer wanted the children for that weekend. Father had replied to mother's concession by telling her that he was keeping the children overnight and also taking them away for the weekend. In retaliation to father's disregard of her request, mother made the children unavailable to father on the weekend. Father became extremely angry and called mother's residence, leaving a message on the answering machine in which he called mother a vulgar name and told the children that mother had ruined the weekend for them.

Father also wants to care for the children during mother's vacations. Last year mother had her grand-

mother care for them during her vacation instead of allowing father to do so. Father contends that he and the grandmother do not enjoy a good relationship and that the grandmother denigrates him in the children's presence.

Father contends that the other significant problem besides mother's imposing unreasonable limitations on his access to the children is money. Father pays 45 percent of his income to mother under the terms of the parties' separation agreement. Father testified that even though mother gets more than $50,000 per annum she constantly asks him to pay for incidentals such as Becci's band trips, chorus trips, and soccer registration fees, children's birthday gifts, sports equipment, Gary's daycare expenses, a flute, and all the children's haircuts. Over the past two years father has refused to pay for chorus and band trips, Gary's daycare expenses, and Becci's cheerleading outfit. Father testified that in 1994 he had paid $2,500 in extra expenses for the children.

Father admits that he discusses his alimony obligation with Becci. He testified that he does so because Becci is intelligent enough to understand it and she is entitled to know the truth. Father informed Becci that if the custody order remains the same, then it will be hard for him to pay for anything which is not included in the agreement.

Father pays his alimony obligation by check. He gives the checks to the children to give to mother. Many times father does not put the checks in envelopes.

In June 1995, pursuant to the temporary custody order, Becci stayed with father for the month and the boys resided with him for two weeks. Father testified that this arrangement broke up the family unit and that the boys were upset that they were not included in the same arrangements as Becci. For this reason, father

does not want a permanent custody order to split the children.

Father has spanked all the children to discipline them. Mother worries that he may spank the children in anger. Mother does not believe in spanking and prefers to give the children "time-out" and other forms of non-corporal punishment. Father sees corporal punishment as an adjunct to more universally accepted forms of punishment.

Both parties complained that the other makes too many telephone calls to the children when each has custody. Both parties deny that they do so.

The clinical psychologist, Peter Thomas, Ph.D., who met with the parties in a therapeutic setting testified. Dr. Thomas found Becci to be bright, energetic, open, and mature beyond her years. Becci felt that she was caught in the middle of her parents. Overall, she was doing well with no extreme emotional problems. Becci wants to alternate living with each parent on a monthly basis.

Brady has a small problem of hostility. He was doing well otherwise. Brady did not know with whom he wanted to live.

Dr. Thomas found that Gary is very attached to Brady. Gary, however, has less conception of what is going on and does not exhibit any of the anger which Brady shows sometimes.

Dr. Thomas testified that father is bright, intense, and aggressive. Father becomes very angry at times which is overwhelming to mother. Father, however, had been responsive to Dr. Thomas' intervention and had listened to what Dr. Thomas had said. Father acknowledges anger is a problem and that he is working on controlling his anger. Father told Dr. Thomas that his interactions with mother bring out his anger because he feels that mother is intrusive and gives unreasonable responses to his requests. Dr. Thomas stated that father's

manner of handling his anger is unproductive but that he is "somewhat better."

Dr. Thomas found that mother's greatest strength is that she is an emotional, warm person. Her greatest difficulty is that when she feels overwhelmed by father she becomes closed and concerned for the children because she projects her own feelings onto the children. Dr. Thomas believes that mother must let go of some of her concerns and become less protective of the children when they are in father's custody. Dr. Thomas does not expect father to act out his anger with the children based on the history of his relationship with them and the bond which exists between them. Mother, also, was receptive to Dr. Thomas' suggestions.

Dr. Thomas is not optimistic about the parties' ability to resolve conflicts without professional intervention. He believes that a conflict resolution procedure is a reasonable goal and can be put in place for these parties. Dr. Thomas thinks that both homes are positive influences for the children and offer significant life experiences; therefore, it would be beneficial for the children to spend significant time, equal if possible, in each home. Dr. Thomas feels that each party should have an equal share in making decisions, including medical decisions, which affect the children.

Richard F. Small, Ph.D., performed the psychological custody evaluation. Both parents, especially father, seem to encourage Becci to take sides and be an active participant in the custody dispute. Dr. Small feels that Becci is privy to too much information, especially from father. He determined that Becci frequently finds herself in the middle of the parties' disputes, especially those concerning money. Dr. Small also believes that Brady knows more details than he should about the custody dispute. Brady appeared to get most of his information from father.

Becci told Dr. Small that she wanted to spend an equal amount of time with both parents. Dr. Small noted that Becci's reasons for wanting such an arrangement were largely based on financial considerations.

Dr. Small found that mother is caring and involved with the children and appropriately interested in their emotional development. Dr. Small determined that father exhibits a lack of patience and a clear predilection for control; father is interested not only in his children, but also in having events turn out the way that he envisions.

Mother played a telephone answering tape for Dr. Small in which father told her and her paramour that Brady needed to be spanked more often by them. Father, however, informed Dr. Small that he does not spank the children because he does not need to do so and sees little necessity for spanking.

Unlike father, Dr. Small does not think that mother exercises bad judgment in consulting professionals regarding important custody decisions or that mother relied unduly on therapists. Dr. Small believes that both parties should have an equal share in major decisions, including medical issues, because father's judgment could be affected by his emotion.

Dr. Small testified that there is little reason to reverse custody to give father primary custody and mother visitation and that such a change could, in fact, be harmful. The children have flourished under mother's care and father seems more prone than mother to attempt to alienate the children from the other parent. Dr. Small does not think that it is advisable to separate the children, but he does believe that Becci could have more visitation with father than the boys; however, Becci should not have complete control over her visitation schedule.

Dr. Small found that it was a close decision as to whether to give mother primary custody or alternate custody between the parties for all three children. Both parents provide positive role models, potentially good parenting skills, and availability to their children when they do not permit their power struggles to put the children's interests secondary. During their struggles, the parties convince themselves that they are acting in the children's best interests.

Dr. Small testified that if the court increased father's periods of partial custody the order should approach an equal split, but not exactly equal. Any order needs clearly defined guidelines and set periods. If conflicts worsen, then Dr. Small would definitely give mother primary custody.

Dr. Small, like Dr. Thomas, believes that mediation might be helpful on an as needed basis when problems arise between the parties. In order for mediation to work, however, both parties must be comfortable with the mediator.

In custody disputes the controlling question and paramount concern of the court is the best interests of the children; all other considerations are deemed subordinate to the children's physical, intellectual, moral, and spiritual well-being. *Warren v. Rickabaugh*, 410 Pa. Super. 451, 600 A.2d 218 (1991). In the case sub judice both parties love their children and are concerned about them. Both parents are intelligent and capable of good parenting. However, both, especially father, seek to impose their will on the other. Father believes that he has the right because he believes that he is more intelligent than mother and has more education than mother and because he always made the decisions during the marriage. Mother is tired of father's attempts to control and resists him whenever she can. Despite mother's frequently legitimate concerns father unilat-

erally does what he pleases because he believes that mother's objections are invalid. Assuming arguendo that father is correct, father ignores one important fact—that under the present custody order mother has the right to make such decisions and if father was unhappy with them, it was his duty to seek court intervention, not his right to use self-help. A party's ability to obey a court order is an important consideration for the court in determining custody. Father's inability to do so is a factor in this court's final order.

These parties cannot get along and perhaps they never will. However, hostilities between the parents are relevant only insofar as they constitute a threat to the children or affect the children's welfare. *Nancy E.M. v. Kenneth D.M.*, 316 Pa. Super. 351, 462 A.2d 1386 (1983). Fortunately, despite the parties' conduct, the children appear to have escaped relatively unscathed with the possible exception of Brady. Therefore, the court will not limit any party's access to the child.

The court believes that mother is largely responsible for the children's emotional well-being. She has the children the majority of the time. Father, more than mother, draws the children into the battles. It is father who informed Becci about the finances. It is father who leaves messages for the children which denigrate mother. It is father who uses the children to deliver his alimony checks to mother. The court agrees with Dr. Small that father is more prone than mother to attempt to alienate the children's affections. The court further notes that it was mother who moved with the children so that they could be near father.

The children love both parents. Becci expresses a desire to spend more time with father. Underlying her decision at least in part is a concern for her material comfort. Father has informed her that he may not be able to do as much for her in the future if the children do not live with him. Brady does not want to verbalize

a decision. Gary wants to live with mother. Since the boys are young, the court has not given much weight to their desires. However, where the natural parents are both fit, the hearing judge must give positive consideration to the parent who has been the primary caretaker. *Fisher v. Fisher,* 370 Pa. Super. 87, 535 A.2d 1163 (1988). For this reason, the court has given mother positive consideration in establishing a final order.

The court has given great weight to the expert testimony presented in this case. Indeed, the Superior Court deems it an abuse of discretion for the hearing judge to accept as unpersuasive and totally discount uncontradicted expert testimony. *Murphey v. Hatala,* 350 Pa. Super. 433, 504 A.2d 917 (1986).

The court, like Dr. Small, does not believe that a change of primary custody is necessary or even warranted. The children are doing well under the present permanent order. Therefore, based on the evidence, the court will not make father the primary custodian of the children.

Father stresses that the children have done well under the temporary order which alternates custody between the parties. The problem with his reasoning is that the long-term effects of the order cannot be evaluated. Too much of the time which the temporary order has been in effect has been during the summer so there was no opportunity to determine how the children would adjust during the school year. The court believes that the children, especially the boys, need a home base for stability and security.

The court believes, however, that father is a fit parent and that he possesses strengths which are positive. He makes decisions quickly and forcefully; he is a leader. He loves his children and wants to spend more time with them.

For these reasons, the court finds that father should receive more time with the children but that mother should still retain primary physical custody. In order to reduce the opportunity for hostilities to occur between the parties the court has attempted to craft an order which is precise. For those times when the parties cannot agree a provision for arbitration/mediation has been included.

The court has drafted a somewhat exact order. At this point the court wants to address Becci's situation. Becci is included in the custody provisions as written. However, Becci is a young woman, almost 16 years old. She will soon be able to drive. With a driver's license comes added mobility and more freedom. The court acknowledges and wants the parties to realize that Becci will not always want to abide by the letter of the order. Additionally, she may have activities that interfere with some of the provisions so she may have to change the schedule as ordered. Becci is older than the boys and possesses strong opinions. The parties must learn to accommodate Becci's needs and growth. The court wants the parties to cooperate in Becci's custodial arrangements and not run to the courthouse on every issue. The parties must learn to be flexible and consider Becci's best interests, as well as those of the other children. The parties must learn to accede to Becci's wishes when it is her best interest to do so.

In accordance with the foregoing opinion the court enters the following order:

## ORDER

And now, October 31, 1995, it is hereby ordered as follows:

22

1. The parties shall share legal custody of the minor children.

2. Defendant, Rebecca West, mother, shall have primary physical custody of the minor children subject to the rights of plaintiff, William J. West Jr., father, to partial custody and visitation as follows:

(a) From September through June of each year he shall have the right of partial physical custody on the first Wednesday of every month from 5 p.m. until Monday at 8 a.m., 12 days later. Mother shall have visitation with the children on the second Thursday of father's custody from 5 p.m. until 8:30 p.m.

(b) From September through June of each year he shall have the right of partial physical custody on the fourth and fifth Thursdays of each month from 5 p.m. until 8:30 p.m.

(c) At such other times as the parties may mutually agree.

3. Father shall have physical custody of the children every July and mother shall have physical custody every August. During these two months the noncustodial parent shall have custody of the children on one evening per week on a day to be agreed upon by the children, on one evening per week on a day to be agreed upon by the parties or if no agreement is possible, on Thursday evening from 5 p.m. until 8:30 p.m. and on alternate weekends from Friday at 5 p.m. until Sunday at 8:30 p.m.

4. The parties shall alternate the following named holidays from 5 p.m. the preceding evening until 8:30 p.m. on said holiday: New Year's Day, President's Day, Easter Sunday, Memorial Day, July 4, Labor Day, Thanksgiving Day.

5. Father shall always have custody of the minor children from 8 a.m. until 8:30 p.m. on Father's Day and mother shall always have custody of the minor children from 8 a.m. until 8:30 p.m. on Mother's Day.

6. During each Christmas vacation period, the parties shall alternate the following periods of partial custody:

(1) December 23 at 5 p.m. to December 24 at 8:30 p.m.;

(2) December 24 at 8 p.m. to December 25 at 3 p.m.;

(3) December 25 at 3 p.m. to December 26 at 10 a.m.;

(4) Father shall also have periods of partial custody for three additional days, which shall include two overnight periods. The first day shall begin at 8 a.m. and the third day shall end at 8:30 p.m.

In 1995 father shall have no. 1, no. 3, and no. 4, and in 1996 father shall have no. 2 and no. 4. This pattern shall repeat every two years.

7. Each parent shall schedule the children's vacations with them when the children are scheduled to be with that parent.

8. Neither parent is to remove any of the children from school for vacation purposes, unless mutually agreed upon by the parties, which agreement may not be unreasonably withheld. This means that if the vacation is to a location which the school district considers to be an educational trip it would be reasonable that the children would be permitted to go provided that the school does not withhold permission or recommend that the child(ren) not go due to their academic standing.

9. Both parties shall ensure that the children are present at all extracurricular activities and shall pay all

customary and incidental charges and expenses while the children are in their custody.

10. Both parties shall have the following rights with respect to the children; reasonable telephone calling privileges limited to one call per day except when a child is ill; access to report cards and other relevant information concerning the progress of the children in school; approval of extraordinary medical and/or dental treatment except in the case of an emergency and provided that such approval shall not be unreasonably withheld; approval of summer camp and schools provided that such approval shall not be unreasonably withheld; and both parties shall provide to the other all information as much in advance as possible any matters respecting the children so as to provide the other parent ample opportunity to participate and/or attend official functions and/or medical or educational appointments.

11. In the event of any serious illness of the children at any time, the party then having custody of said child or children shall immediately communicate with the other party by telephone or any other means, informing the other party of the nature of the illness. During such illness, each party shall have the right to visit with the child or children as often as he or she desires, consistent with the proper medical care of said child or children. The word "illness" as used herein shall mean any disability which confines the child or children to bed under the direction of a licensed physician for a period in excess of 48 hours. In the event either party desires non-emergency, non-routine healthcare for the children, the other parent shall be given prior notice sufficient to allow said other parent to attend such appointment or consultation, and if the parties are unable to agree on said non-routine healthcare, the matter shall be submitted to a mediator/arbitrator.

12. If any party who has custody of the children, must leave the children in the care of someone else for more than 72 hours the custodial parent shall contact the noncustodial parent to determine if that parent wants to care for the children in the custodial parent's absence.

13. For a period of three months from the date of this order, the parties shall have a "cooling-off" period during which they shall communicate by FAX machines only. Each party is responsible for buying his or her own machine and to exchange FAX numbers through their counsel within five days from the date of this order. The parties are to continue to use the FAX machines for communication beyond three months if they believe they cannot communicate in a civilized manner. In no event shall any contact between the parties ever be done with the children as messengers.

14. The parties shall immediately engage a mediator/arbitrator to resolve conflicts which arise between them in regard to the execution of this order. If the parties cannot agree on a mediator/arbitrator, each party shall select a counselor. The two counselors shall consult with each other and appoint a mediator/arbitrator of their own choosing. If after mediation a resolution cannot be reached, the decision of the mediator/arbitrator is final except that each party shall always have recourse to petition the court to determine the child's best interests in the event they believe that the arbitrator's decision is *clearly* not in the children's best interest. If the court finds that recourse to the court was unreasonable, then counsel fees shall be awarded against that party. Father shall pay 75 percent and mother shall pay 25 percent of the cost of mediation/arbitration unless the mediator/arbitrator believes that a party was unreasonable, in which case the court may assess the costs against one or the other party in a different proportion.

15. Neither party shall disparage or denigrate the other parent in the presence of any child nor permit others to do so. Each parent will try to encourage the development of the parent-child relationship between each child and each parent.